ERNEST GALVAN – 196065
MARC J. SHINN-KRANTZ – 312968
BRENDA MUÑOZ – 328813
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: egalvan@rbgg.com
mshinn-krantz@rbgg.com
bmunoz@rbgg.com

Attorneys for Plaintiff
HUMAN RIGHTS DEFENSE CENTER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

HUMAN RIGHTS DEFENSE CENTER,

Plaintiff,

v.

COUNTY OF RIVERSIDE; CHAD BIANCO, Sheriff, individually and in his official capacity; HERMAN LOPEZ, Corrections Assistant Sheriff, individually and in his official capacity; MIKE KOEHLER, Corrections Operations Chief Deputy, individually and in his official capacity; MICHAEL MOULTON, Correctional Captain for Blythe Jail, individually and in his official capacity; BRUCE PHILLIPS, Correctional Captain for Robert Presley Detention Center, individually and in his official capacity; and JOHN AND JANE DOES 1-10, Staff, individually and in their official capacities,

Defendants.

Case No. 5:25-cv-03520-DSF-SK

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Date: February 23, 2026
Time: 1:30 p.m.
Crtrm.: 7D, Seventh Floor

Judge: Hon. Dale S. Fischer

# TABLE OF CONTENTS


Page

NOTICE OF MOTION ........ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

I. HRDC'S PUBLICATIONS AND BOOKS ........ 2

II. DEFENDANTS' UNCONSTITUTIONAL MAIL AND BOOK POLICIES AND PRACTICES. ........ 4

LEGAL STANDARD ........ 10

ARGUMENT ........ 10

I. HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS. ........ 10

A. Defendants Are Violating HRDC's Constitutional Rights to Communicate With Incarcerated Persons. ........ 10

1. Defendants' Mail Policies And Practices Are Not Rationally Related To Any Legitimate Penological Objectives. ........ 12

2. Defendants Have Failed To Provide Alternative Means Of Exercising HRDC's Rights to Communicate with Incarcerated Persons. ........ 16

3. Defendants' Mail Policies and Practices Fail the Third and Fourth Prongs of the Turner Standard (Effect On Resources and Feasibility of Alternative Policies). ........ 17

B. Defendants Have Violated HRDC's Constitutional Rights to Due Process By Failing To Provide HRDC With Adequate Notice And Opportunity To Challenge Defendants' Censorship. ........ 18

C. Defendants' Actions Violate the California Bane Act ........ 20

II. A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM. ........ 21

III. THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION. ........ 22

IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST. ........ 23

V. THE BOND REQUIREMENT SHOULD BE WAIVED. ........ 24

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashker v. Cal. Dep't of Corrs.*,
350 F.3d 917 (9th Cir. 2003) .......... 11, 12

*Baca v. Moreno Valley Unified Sch. Dist.*,
936 F. Supp. 719 (C.D. Cal. 1996) .......... 25

*Beard v. Banks*,
548 U.S. 521 (2006) .......... 16

*Busquets-Ivars v. Ashcroft*,
333 F.3d 1008 (9th Cir. 2003) .......... 15

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs.*,
181 F. Supp. 2d 1111 (E.D. Cal. 2001) .......... 24

*Clement v. Cal. Dep't. of Corr.*,
364 F.3d 1148 (9th Cir. 2004) .......... 18

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 11

*Cornell v. City & Cnty. of San Francisco*,
17 Cal. App. 5th 766 (2017) .......... 21

*Crofton v. Roe*,
170 F.3d 957 (9th Cir. 1999) .......... 12

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 21

*Frost v. Symington*,
197 F.3d 348 (9th Cir. 1999) .......... 12

*Hernandez v. County of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015) .......... 25

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .......... 10

*Hrdlicka v. Reniff*,
631 F.3d 1044 (9th Cir. 2011) .......... 12, 18

*Human Rights Defense Center v. Sw. Va. Reg'l Jail Auth.*,
No. 1:18-cv-00013, 2018 WL 3239299 (W.D. Va. July 3, 2018) .......... 22

*Jacklovich v. Simmons*,
392 F.3d 420 (10th Cir. 2004) .......... 19

*Jones v. Caruso*,
569 F.3d 258 (6th Cir. 2009) ... 21

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) ... 24

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ... 10, 21, 23

*Krug v. Lutz*,
329 F.3d 692 (9th Cir. 2003) ... 19

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ... 10

*McKune v. Lile*,
536 U.S. 24 (2002) ... 16

*Montcalm Publ'g Corp. v. Beck*,
80 F.3d 105 (4th Cir. 1996) ... 19

*Morrison v. Hall*,
261 F.3d 896 (9th Cir. 2001) ... 17, 18

*Paris Adult Theatre I v. Slaton*,
413 U.S. 49 (1973 ... 16

*Pell v. Procunier*,
417 U.S. 817 (1974) ... 11, 16

*Prison Legal News v. Cnty of Ventura*,
No. CV 14–773–GHK (ex), 2014 WL 2519402 (C.D. Cal. May 29, 2014) ... 22, 24

*Prison Legal News v. Cook*,
238 F.3d 1145 (9th Cir. 2001) ... 11, 12, 18, 19

*Prison Legal News v. County of Sacramento*,
No. 2:11-CV-00907 JAM-DAD, 2012 WL 1075852 (E.D. Cal. Mar. 8, 2012) 13, 22

*Prison Legal News v. Lehman*,
397 F.3d 692 (9th Cir. 2005) ... 12, 18

*Prison Legal News v. Ryan*,
39 F.4th 1121 (9th Cir. 2022) ... 12

*Procunier v. Martinez*,
416 U.S. 396 (1974) ... passim

*Sammartano v. First Judicial Dist. Court*,
303 F.3d 959 (9th Cir. 2002) ... 23

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) ... 24, 25

*Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177 (N.D. Cal. 2009) ........ 24

*Scalia v. County of Kern*, 308 F.Supp.3d 1064 (E.D. Cal. 2018) ........ 21

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ........ 10

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) ........ 10, 11, 19

*Turner v. Safley*, 482 U.S. 78 (1987) ........ passim

*United Food & Com. Workers Loc. 99 v. Brewer*, 817 F. Supp. 2d 1118 (D. Ariz. 2011) ........ 24

*Walker v. Sumner*, 917 F.2d 382 ........ 13

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ........ 21

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........ 10, 23

**CONSTITUTIONS**

Cal. Const. art. I, § 2 ........ 2

Cal. Const. art. I, § 7 ........ 2

U.S. Const. amend. I ........ 2

U.S. Const. amend. XIV ........ 2

**STATUTES**

Cal. Civ. Code § 52 ........ 21

Cal. Civ. Code § 52.1 ........ 2, 20, 21

Cal. Gov. Code §§ 810 *et seq.* ........ 2

I.R.C. § 501(c)(3) ........ 2

**RULES**

Fed. R. Civ. P. 65 ........ 24

**NOTICE OF MOTION**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 23, 2026, at 1:30 p.m., or as soon thereafter as the matter may be heard, Plaintiff Human Rights Defense Center, by its undersigned counsel, pursuant to Federal Rule of Civil Procedure 65(a), will and hereby does move this Court to issue a preliminary injunction enjoining Defendants County of Riverside (the "County"), Chad Bianco, Herman Lopez, Mike Koehler, Michael Moulton, and Bruce Phillips (collectively, "Defendants") from implementing unconstitutional mail policies and practices and refusing to deliver Plaintiff's publications and correspondence to incarcerated persons in Defendants' custody, in violation of Plaintiff's rights to free speech and due process under federal and California law. This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declarations of Paul Wright and Louis Christopher Eichenlaub filed herewith, the pleadings in the above-captioned matter, and any oral argument or evidence permitted at any hearings on this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiff Human Rights Defense Center ("HRDC" or "Plaintiff") files this motion to enjoin the Defendants from unconstitutionally censoring HRDC's books, magazines, and correspondence mailed to incarcerated persons at Riverside County detention facilities, and from failing to provide due process to challenge censorship decisions. HRDC's mission is to provide incarcerated persons with reading materials with news and analysis relevant to their constitutional and human rights and options for accessing education while incarcerated. HRDC publishes and distributes magazines and books to incarcerated persons, and also mails them other written communications. Since April 2024, Defendants have engaged in at least thirty-three (33) separate instances of unlawful suppression of HRDC's speech, by refusing to deliver books, magazines, and correspondence mailed by HRDC to persons incarcerated at the County's detention facilities, in violation of the First

Amendment and Article I, Section 2 of the California Constitution . Defendants have also failed to provide adequate notice and an opportunity to challenge the censorship decisions, in violation of the Due Process Clause of the Fourteenth Amendment and Article I, Section 7 of the California Constitution. By implementing these policies and practices with reckless disregard for clearly established free speech and due process rights of Plaintiff and others who send publications and correspondence to incarcerated persons by mail, Defendants are interfering with the exercise and enjoyment of Plaintiff's constitutional rights in violation of the Bane Act, California Civil Code § 52.1.

HRDC's publications and correspondence pose no threat to the safety or security of the County's detention facilities and, in fact, have been successfully mailed to incarcerated persons in thousands of jails and prisons across the United States for more than thirty-five (35) years without incident. Plaintiff attempted to resolve these violations without litigation by filing a Claim for Damages pursuant to the California Government Claims Act on June 16, 2025. The County rejected Plaintiff's claim on July 2, 2025, without any information about why HRDC's mail was being censored or whether there was any means by which HRDC could appeal the censorship by Defendants.

As Defendants' censorship is not rationally related to any legitimate penological interest, and HRDC's free speech rights are being eviscerated without due process, Plaintiff's likelihood of success on the merits is great. The violations of HRDC's constitutional rights are causing irreparable harm, and the balance of hardships from Defendants' continuing refusal to deliver Plaintiff's correspondence and publications tilts sharply toward Plaintiff. A preliminary injunction should be granted.

## FACTUAL BACKGROUND

### I. HRDC'S PUBLICATIONS AND BOOKS

HRDC is a not-for-profit charitable organization under Section 501(c)(3) of the Internal Revenue Code.. *See* Declaration of Paul Wright in Support of Plaintiff's Motion for Preliminary Injunction ("Wright Decl.") ¶ 2. For over thirty-five (35) years, HRDC has focused its mission on public education, advocacy, and outreach to incarcerated

persons and the public about the economic and social costs of prisons to society, and to help incarcerated persons to educate themselves about their constitutional and human rights and to learn about accessing education while incarcerated. *Id.* HRDC accomplishes this mission through advocacy, litigation, and publication and distribution of books, magazines, and other information about correctional facilities and the rights of incarcerated persons. *Id.*

HRDC publishes two soft-cover magazines, which are each printed on newsprint bound by two small staples. *Id.* ¶¶ 4-5. HRDC publishes and distributes an award-winning monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights* ("*Prison Legal News*"), which contains news and analysis about the conditions and management of correctional facilities, the rights of incarcerated persons, court opinions, and other matters of interest to incarcerated persons. *Id.* ¶ 4. HRDC also publishes and distributes a monthly magazine titled *Criminal Legal News Dedicated to Protecting Human Rights* ("*Criminal Legal News*"), which contains news and analysis about individual rights, court rulings, and other criminal legal-related issues. *Id.* ¶ 5. HRDC's magazines provide timely, in-depth coverage of judicial decisions and other recent events concerning the criminal legal system in a way that would be impossible through other means of communication. *Id.* ¶ 6.

HRDC also distributes several different soft-cover books on criminal justice, health, and legal issues that are of interest to incarcerated persons and others. *Id.* ¶ 7. Pertinent to this case, HRDC publishes and distributes the *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*Prisoners' Handbook*"), which provides information on enrolling at accredited higher educational, vocational and training schools. *Id.* HRDC also publishes and distributes *The Habeas Citebook: Ineffective Assistance of Counsel* ("*Habeas Citebook*"), which describes the procedural and substantive complexities of federal habeas corpus litigation with the goal of identifying and litigating claims involving ineffective assistance of counsel. *Id.* HRDC does not publish, but is the sole national distributor of *Protecting Your Health and Safety* ("*PYHS*"),

which describes the rights, protections and legal remedies available to persons concerning their health and safety while they are incarcerated. *Id.* HRDC also distributes *The Best 500+ Non-Profit Organizations for Prisoners & Their Families* ("*Non-Profits for Prisoners*"), which provides a comprehensive list of non-profit organizations that assist prisoners and their families. *Id.*

HRDC also communicates with incarcerated persons through the mail by sending them informational brochure packets ("Info Packs"), and letters that provide pertinent information about HRDC's publications and related topics. *Id.* ¶ 9.

Since its creation in 1990, HRDC has sent its publications and books to incarcerated persons and law librarians in more than 3,000 correctional facilities in all fifty states, including at the highest security prisons. *Id.* ¶ 12. HRDC mails publications and books to hundreds of persons held in numerous California jails, prisons, and secure hospital facilities throughout the state. *Id.* In its more than 35-year history, HRDC is not aware of and has never been notified of any security incident caused by any of its publications or correspondence at any jail or prison. *Id.* ¶ 21.

## II. DEFENDANTS' UNCONSTITUTIONAL MAIL AND BOOK POLICIES AND PRACTICES.

Since April 2024, HRDC has mailed magazines, books, and other correspondence to incarcerated persons at Riverside County's five detention facilities including: Blythe Jail; Cois M. Byrd Detention Center ("Byrd Detention Center"); John J. Benoit Detention Center ("Benoit Detention Center"); Larry D. Smith Correctional Facility ("Smith Correctional Facility"); and Robert Presley Detention Center ("Presley Detention Center") (collectively, the "Detention Facilities"). *Id.* ¶¶ 22-40. Each of these items were individually addressed and separately mailed with postage fully paid. *Id.* Defendants, however, have refused to deliver many of these items to the intended recipients. *Id.* ¶¶ 45-46. Since April 2024, Defendants have censored at least thirty-three (33) items of mail sent to incarcerated persons at the Detention Facilities by HRDC. *Id.* ¶ 45. Specifically, thirty (30) of these items were returned by the Blythe Jail, and three (3) of these items were

returned by the Presley Detention Center. *Id.*

The thirty-three (33) returned items include: sixteen (16) issues of *Prison Legal News*; thirteen (13) issues of *Criminal Legal News*; three (3) copies of *PHYS*; and one (1) copy of *Non-Profits for Prisoners*. *Id.* ¶ 46. Many of the rejected items were returned to HRDC marked in various ways, including "CONTENTS NOT SUITABLE FOR CORRECTIONAL FACILITY," "NO STAPLES," "RETURN TO SENDER," "MAIL POLICY VIOLATION," and/or "RTS." *Id.* ¶ 47. One of the returned books was marked: "RTS, No 3rd party books, Amazon or Barnes and Noble." *Id.*

The Riverside County Sheriff's Office's policy on the delivery of books, magazines, and periodicals (the "Publication Policy") to individuals in custody at the Detention Facilities is available on the public website of the Riverside County Sheriff's Office at https://ca-riversidesheriff-hidden.civicplus.com/218/Books-Magazines (last visited December 11, 2025). A copy of The Publication Policy is attached as **Exhibit I** to the Wright Declaration, and it provides as follows:

> **Books & Magazines**
>
> All books, magazines, and periodicals must be prepaid and delivered by the United States Postal Service only. The publication/subscription shall be mailed directly from the publisher or originate from a verifiable and reputable internet/mail order company or a bookstore via their internet or mail order facilities.
>
> All books, magazines, and periodicals must have the inmate's complete name and booking number clearly marked.
>
> **Not Allowed (Books & Magazines)**
>
> - No more than 3 books can be sent at one given time.
> - Hardback or leather-bound books.
> - Obscene, or sexually oriented publications or writings (including magazines such as Playboy, Penthouse, Hustler, etc.) and mail containing information concerning where, how or from whom such matter may be obtained.
> - Any matter of character tending to incite murder, arson, riot, racism, or any other form of violence (including anything which may adversely affect jail security due to a gang-type theme or pictures depicting gang activity).
> - Any other matter concerning unlawful gambling or an unlawful lottery.

- Used books, magazines or periodicals.

Defendants' general mail policy (the "Mail Policy") is also available on the public website of the Riverside County Sheriff's Office at https://ca-riversidesheriff-hidden.civicplus.com/221/Inmate-Mail-Policy (last visited December 11, 2025). A copy of The Mail Policy is attached as **Exhibit J** to the Wright Declaration, and it provides as follows:

> **Inmate Mail Policy**
>
> Inmates are permitted to send and receive unlimited letters each day in order to maintain communications with their legal representatives, families, friends, business associates, and government authorities. Two categories of mail are defined as:
>
> **Regular Correspondence**
>
> Communication to or from inmates through letters. Incoming mail is inspected to prevent the following:
>
> - Transmission of contraband, i.e. drugs or any other prohibited materials or substances into the facility.
> - Escape plans.
> - Criminal conspiracies.
>
> Any other type of threat or compromise to the over-all security of the facility and/or the safety of staff and inmates.
>
> **Legal or Special Correspondence**
>
> Mail between an inmate and:
>
> - All state and federal elected officials
> - All state and federal officials appointed by the Governor or the President of the United States
> - All city, county, state, and federal officials having responsibility for the inmate's present, prior, or anticipated custody, parole, or probation supervision
> - All state and federal judges and courts
> - An attorney at law registered with a state bar association
> - The State Corrections Standards Authority
> - Facility Commander
>   - Incoming legal mail that is legibly noted as "Legal Mail" will be opened and inspected in front of the inmate
>   - All legal mail must have the following "return to sender" information on the envelope and is subject to verification:

        - Law firm name
        - Attorney's complete name
        - Law firm's complete address
    - Legal size paper is authorized for attorney use only
    - Outgoing legal mail may be inspected in the presence of the inmate then sealed and processed with other outgoing mail

**Contraband**

- Narcotics
- Marijuana
- Handcuff keys
- Hacksaw blades
- Postage stamps
- Stickers
- Pictures or photographs may not contain violence, nudity, sexual acts, or gang-related activities including hand signs, decorative stickers, personal checks, etc.
- Used books, magazines or periodicals.

Contraband that is illegal will result in criminal charges being filed. Contraband that is not of a criminal nature will be returned to the sender.

In addition to Defendants' Publication Policy and Mail Policy, Defendants' Rules for Regular Incoming Mail (the "Mail Rules") are also available on the public website of the Riverside County Sheriff's Office at https://ca-riversidesheriff-hidden.civicplus.com/225/Rules-for-Regular-Incoming-Mail (last visited December 11, 2025). A copy of the Mail Rules is attached as **Exhibit K** to the Wright Declaration. The Mail Rules provide, in pertinent part:

**Rejected Mail**

Any mail that is dirty or stained will be considered contaminated and returned to the sender. Mail that contains any of the following will be rejected:

…

- Blank stationery, envelopes, Post-it Notes
    - Colored paper (standard, white, 1-ply paper only, no legal size)
    - Craft materials

- Glitter
- Paper clips
- Parchment or stock paper
- Plastic
- Metal
- Ribbons
- Staples
- Tape

**Please Note**

Envelopes are not given to the inmates. Return addresses are torn off and given to an inmate per the inmate's request.

Stick-on return address labels are **not** allowed due to the adhesive used on the labels.

Other items not listed above will be reviewed on a case-by-case basis to determine any possible compromise or threat to the overall security of the facility and/or the safety of staff and inmates.

Defendants' Publication Policy, Mail Policy, and Mail Rules (collectively "Mail Policies") are unconstitutional on their face and as applied, and they are unduly broad and vague. There is no legitimate penological justification for Defendants to refuse to accept magazines for delivery at the Detention Facilities that are held together with ordinary staples. *See* Declaration of Louis Christopher Eichenlaub in Support of Plaintiff's Motion for Preliminary Injunction ("Eichenlaub Decl.") ¶¶ 45-47. There is no legitimate concern that these small staples pose any potential threat to the safety and security of the Detention Facilities. *Id.* This is especially true because HRDC's publications cover topics of great public concern and contain core protected speech, including political speech and social commentary, and educational information relating to the rights of incarcerated persons, pertinent legal cases, and incarcerated persons' health and safety, Wright Decl. ¶¶ 4-8, 13, 66, and are thus entitled to the highest protection afforded by the First Amendment to the United States Constitution.

Based on the markings on one of the returned books, the Detention Facilities are also banning all books unless they are sent by Amazon or Barnes and Noble. *See id.* ¶ 47.

There is no legitimate penological justification for Defendants to ban all books unless they are sent by Amazon or Barnes and Noble. Eichenlaub Decl. ¶¶ 48-50.

The Mail Policies are also unconstitutional on their face because they provide for censorship of publications or writings that are neither obscene, nor sexually oriented, simply because they may contain information concerning where, how, or from whom such matter may be obtained. There is no legitimate concern that such publications or writings present and it is overbroad to exclude such publications and writings when the Detention Facilities may instead restrict the actually offending material. Eichenlaub Decl. ¶ 44.

The Mail Policies are also unconstitutional on their face and as applied because they fail to provide due process when a publication or mailing is censored. These policies do not provide for any appeals process by which a sender may challenge a decision by Defendants to reject publications or other mailings for delivery to incarcerated persons at the Detention Facilities. Defendants did not provide HRDC with notice of the reason any mailing was rejected beyond vague markings on the outside of items returned via the United States Postal Service's ("USPS") Return to Sender service. Wright Decl. ¶ 47. Defendants also never provided any opportunity to HRDC to challenge the censorship. *Id.* ¶ 56. Thus, the Defendants' policies and practices violate HRDC's Fourteenth Amendment rights to due process.

HRDC brought these problems to the County's attention through a government tort claim submitted on June 16, 2025. *Id.* ¶ 57, Ex. G. The County rejected the claim in a letter dated July 2, 2025. *Id.* ¶ 57, Ex. H. Even after HRDC submitted its tort claim, Defendants have not provided any notice of the reason(s) for rejecting HRDC's mailings or an opportunity to appeal the censorship decisions. *Id.*

By their adoption and application of these policies and practices, Defendants are impermissibly interfering with protected expressive activities and chilling future speech from HRDC and others. Since HRDC continues, and will continue, to communicate with incarcerated persons confined at the Detention Facilities, *see id.* ¶ 58, Defendants' current policies and practices, unless enjoined, will continue to violate HRDC's constitutional

rights, causing irreparable harm.

## LEGAL STANDARD

A preliminary injunction is appropriate where a plaintiff demonstrates "'[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Ninth Circuit precedent "clearly favors granting preliminary injunctions to a plaintiff … who is likely to succeed on the merits of his First Amendment claim." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Under the Ninth Circuit's "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (internal quotation marks and citation omitted). To grant preliminary injunctive relief, a court must only find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (*per curiam*). Under either approach, a preliminary injunction should be issued.

## ARGUMENT

### I. HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

#### A. Defendants Are Violating HRDC's Constitutional Rights to Communicate With Incarcerated Persons.

Defendants' policies and practices violate settled law on the First Amendment rights of publishers and incarcerated persons. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), nor do they bar others "from exercising their own constitutional rights by reaching out to those on the 'inside,'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Courts have long held that publishers and incarcerated persons have First Amendment rights to communicate with each other, subject only to limitations required by legitimate security concerns. "[T]here is no question that publishers who wish to communicate with

those who … willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Id.* at 408. Indeed, the interests of senders and their intended recipients are "inextricably meshed," and "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974), *overruled in part on other grounds by Thornburgh*, 490 U.S. at 411-14. "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id.* at 408.

HRDC's speech covers topics of great public concern and therefore "occupies the highest rung of the h[ie]rarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance"); *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (holding speech contained in *Prison Legal News* is core protected speech).

To withstand First Amendment scrutiny, a jail or prison policy must be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. This inquiry turns on four factors:

> (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Cook*, 238 F.3d at 1149 (citing *Turner*, 482 U.S. at 89-90). If a correctional facility "fails to show that the regulation is rationally related to a legitimate penological objective, [courts] do not consider the other factors," and the rule is invalid. *Ashker v. Cal. Dep't of Corrs.*, 350 F.3d 917, 922 (9th Cir. 2003). While respectful of correctional officials' expertise, *Turner*'s "reasonableness standard is not toothless." *Thornburgh*, 490 U.S. at 414 (internal quotation marks omitted).

Accordingly, the Ninth Circuit has regularly ruled in favor of publishers challenging rules restricting delivery of their publications to incarcerated persons, and has specifically upheld HRDC's right to send *Prison Legal News* to incarcerated persons. *See, e.g.*, *Prison Legal News v. Ryan*, 39 F.4th 1121, 1133, 1136 (9th Cir. 2022) (holding that prison officials violated the First Amendment by restricting sexual material that is not explicit and by redacting an article describing a prison riot); *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (addressing ban on unsolicited publications); *Prison Legal News v. Lehman*, 397 F.3d 692, 703 (9th Cir. 2005) (rejecting regulation that prevented delivery of *Prison Legal News*); *Cook*, 238 F.3d at 1149-50 (same); *Crofton v. Roe*, 170 F.3d 957, 960-61 (9th Cir. 1999) (rejecting ban on gift publications). HRDC is highly likely to prevail on each of the *Turner* factors.[1]

**1. Defendants' Mail Policies And Practices Are Not Rationally Related To Any Legitimate Penological Objectives.**

The first *Turner* factor looks to whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89. "The first factor is a sine qua non …. Therefore, if the prison fails to show that the regulation is rationally related to a legitimate penological objective, [the Court] do[es] not consider the other factors." *Ashker*, 350 F.3d at 922 (citations omitted). Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and the governmental objective must be both 'legitimate and neutral.'" *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (quoting *Turner*, 482 U.S. at 89-90). When a plaintiff "refutes a common-sense connection between a legitimate objective and a prison regulation," the defendant "must present enough counter-evidence to show that the connection is not so 'remote as to render the policy arbitrary or irrational.'" *Id.* at 357

[1] While this case involves HRDC's free speech rights (and not the rights of incarcerated persons), for purposes of this motion, HRDC assumes the Court will apply the *Turner* test to ensure that injunctive relief employs due deference for the exigencies of jail operations.

(citations omitted).

> Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then *demonstrate* both that those specific interests are *the actual bases* for their policies and that the policies are reasonably related to the furtherance of the identified interests. An *evidentiary showing* is required as to each point.

*Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990) (emphasis added).

Here, it cannot be reasonably argued that there is any "valid, rational connection" between Defendants' censorship of HRDC's publications and correspondence and any legitimate governmental interest. HRDC's magazines appear to have been rejected at least in part because they contain staples, although many of the returned magazines were marked both "CONTENTS NOT SUITABLE FOR CORRECTIONAL FACILITY," and "NO STAPLES," so it is unclear whether there are multiple reasons why those magazines were returned. Wright Decl. ¶¶ 44, 47 & Ex. B. Three of the returned books were vaguely marked "MAIL POLICY VIOLATION," so it is unclear exactly why those books were returned. *Id.* One of the returned books was marked "RTS, No 3rd party books, Amazon or Barnes and Noble," *id.*, so the Detention Facilities appear to be rejecting books unless they are sent by one of two vendors (Amazon or Barnes and Noble), even though the Publication Policy permits all books and magazines that are "mailed directly from the publisher or originate from a verifiable and reputable internet/mail order company or a bookstore via their internet or mail order facilities." *Id.* ¶ 59 & Ex. I. None of these stated reasons justify Defendants' censorship of HRDC's publications.

First, Defendants' rejection of Plaintiff's magazines on the ground that they include staples is not supported by any legitimate penological interest. *See Prison Legal News v. County of Sacramento*, No. 2:11-CV-00907 JAM-DAD, 2012 WL 1075852, at *1 (E.D. Cal. Mar. 8, 2012) (preliminarily enjoining jail's refusal to deliver *Prison Legal News* on ground that staples ban not supported by legitimate penological interest). Plaintiff's correctional expert, Louis Christopher Eichenlaub, has over thirty-nine (39) years of experience in corrections, including as Deputy Director of the Federal Bureau of Prisons

("BOP") overseeing daily operations of BOP's headquarters and 121 correctional facilities. Eichenlaub Decl. ¶¶ 2, 10. He testifies that "[p]ut simply, access to stapled publications by incarcerated persons is not a legitimate concern for corrections professionals." *Id.* ¶ 47. The staples used in HRDC's magazines are less than an inch long and are thin, weak, and flimsy. *Id.* ¶ 45. During Mr. Eichenlaub's career in corrections, "tiny gauge magazine staples [like those used in HRDC's publications] have never been identified as the source of significant security problems," and "the evidence-based experience and judgment of [the] broad range of administrators across numerous prison systems has not borne out potential security concerns about magazine staples," which are "commonly accepted in jails and prisons all over the country. *Id.* ¶¶ 46-47.

If publications with staples were a legitimate threat to the safety of correctional facilities, one would presume other well-run jails and prisons would also ban publications with staples. *See Procunier*, 416 U.S. at 414 n.14 ("While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction."). Over one million copies of *Prison Legal News* with staples have been delivered to about 3,000 correctional facilities since the publication commenced in 1990, including death row units, maximum security units, and supermax prisons, yet no correctional facility has reported any security problems due to the staples to HRDC, and HRDC has never been notified of any instance where an ordinary magazine staple such as that used by HRDC to hold together its magazines has ever been used as a weapon or caused a security problem at a correctional institution. Wright Decl. ¶¶ 11-12, 64.

Second, there is no legitimate penological basis for Defendants' to arbitrarily restrict publications unless they are sent by one of two vendors, Amazon or Barnes & Noble. Jails and prisons do have a legitimate penological interest in restricting family or other private individuals from sending publications directly to incarcerated persons to limit contraband from being introduced into the facility, and "[i]t is thus sensible to limit such mailings to those sent from neutral outside distributors and publishers that present no

practical threat to jail security." Eichenlaub Decl. ¶ 49. But there is no practical security risk to allowing HRDC—a not-for-profit charitable organization that has been mailing publications to incarcerated persons at thousands of jails and prisons for over thirty-five (35) years without incident—to mail books and magazines to incarcerated persons. *See* Wright Decl. ¶¶ 2, 11-12, 21, 64; *see also* Eichenlaub Decl. ¶¶ 47, 50, 53-54.

In addition to the censored items that Defendants returned to Plaintiff, the Detention Facilities also presumptively have received and either delivered or censored multiple copies of the same types of publications and correspondence that Defendants have censored. Absent proof to the contrary, "a properly-addressed piece of mail placed in the care of the Postal Service has been delivered." *See Busquets-Ivars v. Ashcroft*, 333 F.3d 1008, 1009 (9th Cir. 2003). Defendants did not provide HRDC with any information as to nine hundred and sixty-four (964) items that were properly addressed to people incarcerated at the Detention Facilities, and thus presumably delivered, including: four hundred and thirty-one (431) copies of *Prison Legal News*, three hundred and eighty-seven (387) copies *Criminal Legal News,* thirty-nine (39) copies of *PYHS*, twelve (12) copies of *Prisoners' Handbook*, two (2) copies of the *Habeas Citebook*, thirty-seven (37) follow-up letters, and fifty-six (56) Info Packs. Wright Decl. ¶ 43. This checkered approach of censoring some items while presumably letting in others is entirely arbitrary and capricious and is not rationally related to any legitimate penological interest. *See* Eichenlaub Decl. ¶ 53. If the Detention Facilities withheld the mailings from their intended recipients, and did not return them to HRDC, that constitutes a violation of HRDC's due process right to notice. Either way, these facts are proof positive that the Defendants' policies and practices are so flawed and violative of HRDC rights that court intervention is necessary. *See id.* ¶¶ 53-54.

Moreover, banning reading materials actually threatens jail security because reading helps to alleviate idleness, boredom, and frustrations that can contribute to disturbances and disciplinary infractions. *Id.* ¶¶ 24, 27-28, 42, 56; Wright Decl. ¶ 13. Such censorship also threatens public safety because the information in HRDC's books and magazines

helps prepare incarcerated persons for reentry into society and reduce recidivism. Eichenlaub Decl. ¶¶ 26-27, 29-30, 36, 40, 56; Wright Decl. ¶ 13. The Supreme Court has recognized that since "most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (alteration omitted) (quoting *Pell*, 417 U.S. at 823). Further, "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation …." *Procunier*, 416 U.S. at 412; *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63 (1973) (citing the "well nigh universal belief that good books … lift the spirit, improve the mind, enrich the human personality, and develop character"). Understanding the benefits of the availability of reading materials, corrections professionals throughout the country recognize that any minimal security concerns associated with incoming publications are outweighed by the safety and security benefits they bring. *See* Eichenlaub Decl. ¶¶ 26-28. Defendants' censorship is not rationally related to any legitimate penological interest.

**2. Defendants Have Failed To Provide Alternative Means Of Exercising HRDC's Rights to Communicate with Incarcerated Persons.**

The second *Turner* factor looks to whether alternative means exist to exercise the constitutional right. The absence of alternative means is evidence that the prison regulations in question are unreasonable. *See Beard v. Banks*, 548 U.S. 521, 532 (2006).

Here, Defendants' censorship of HRDC's publications and correspondence leaves no alternative means of exercising the First Amendment right at issue, *see Turner*, 492 U.S. at 90—the right to distribute its publications to incarcerated persons in furtherance of its mission to help incarcerated persons to educate themselves about their constitutional and human rights and to learn about accessing education while incarcerated. *See* Wright Decl. ¶¶ 13, 66. HRDC cannot reasonably be expected to communicate its writings to incarcerated persons by telephone or in-person. *Id.* ¶ 68. Even if it had other practical ways of communicating with incarcerated persons, HRDC's messages can be conveyed effectively only through print publications. *See Morrison v. Hall*, 261 F.3d 896, 904 (9th

Cir. 2001) (even if incarcerated persons can obtain information from other means, such as television or radio, those avenues "should not be considered a substitute for reading newspapers and magazines"). The monthly issues *of Prison Legal News* and *Criminal Legal News* provide incarcerated persons with timely, in-depth coverage of judicial decisions and other recent events concerning our nation's criminal legal system in a way that no other method of communication can match. Wright Decl. ¶¶ 6, 68. The books that HRDC distributes through the mail similarly provide incarcerated persons with in-depth information about their rights, protections, and legal remedies, and about enrolling at accredited higher educational, vocational, and training schools, which could not reasonably or practically be communicated in any other form. *Id.* ¶ 8. Under Defendants' current policies and practices, HRDC is left with no practical way to reach its intended audience.

**3. Defendants' Mail Policies and Practices Fail the Third and Fourth Prongs of the Turner Standard (Effect On Resources and Feasibility of Alternative Policies).**

The third and fourth *Turner* factors turn on whether accommodating the First Amendment right at issue will impose a significant burden on prison officials and whether ready alternatives to the challenged policies exist. *Turner*, 482 U.S. at 90-91. Where a plaintiff "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90.

Allowing the exercise of the First Amendment rights at issue here will create no significant burden on officials at the Detention Facilities, incarcerated persons, or the allocation of resources. Defendants would simply be required to deliver HRDC's publications and correspondence along with the other mail delivered to incarcerated persons every day. This is what thousands of other correctional facilities do with the very HRDC mailings that Defendants are refusing to deliver. Wright Decl. ¶¶ 11-12. HRDC sends individually addressed mailings to a limited number of incarcerated persons who

subscribe to its magazines or who place orders for books published and/or distributed by HRDC, or who HRDC specifically identifies as potential subscribers or people likely to be in need of the information contained in the publications that HRDC distributes. *Id.* ¶ 14.

Regardless, limited effects on staff time do not justify restrictions on First Amendment rights. *See, e.g.*, *Lehman*, 397 F.3d at 700 (rejecting regulation designed to reduce volume of mail); *Cook*, 238 F.3d at 1151 (rejecting administrative burden justification for banning certain type of mail where lifting the ban would result only in "the addition of 15 to 30 pieces of mail" each day); *Clement v. Cal. Dep't. of Corr.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (*per curiam*) (banning certain type of mail to reduce total volume is "arbitrary" method to reduce mail volume).

That thousands of correctional facilities nationwide, including throughout California, allow incarcerated persons to receive all types of HRDC mailings without creating penological problems, Wright Decl. ¶¶ 12, 21, highlights that ready alternatives to Defendants' censorship are available. *See, e.g.*, *Hrdlicka*, 631 F.3d at 1055 (final *Turner* factor favored publisher where it was undisputed that publisher's magazine was already distributed in other California county jails); *Morrison*, 261 F.3d at 905 (looking to California state prison system mail policies to conclude Oregon prison mail policies were an exaggerated response). Distribution of HRDC's books and magazines to persons incarcerated in these other facilities demonstrates that Defendants' censorship is unnecessary and unreasonable, and is an "exaggerated response" that cannot stand. *Turner*, 482 U.S. at 90-91.

### B. Defendants Have Violated HRDC's Constitutional Rights to Due Process By Failing To Provide HRDC With Adequate Notice And Opportunity To Challenge Defendants' Censorship.

A publisher's right to communicate with incarcerated persons is rooted not only in the First Amendment, but also the Due Process Clause of the Fourteenth Amendment:

> [T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by

> the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion.

*Procunier*, 416 U.S. at 417-18. The Due Process Clause requires that each time a jail or prison refuses to deliver a publication or other correspondence to the intended recipient, it must provide both the incarcerated person and the sender notice and an opportunity to challenge the censorship. *Id.* at 418-19 (requiring "that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence"). This requirement is clearly established and is not subject to the four-pronged *Turner* analysis. *See Krug v. Lutz*, 329 F.3d 692, 698-699 & n.5 (9th Cir. 2003); s*ee also Cook*, 238 F.3d at 1152-53; *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004).

Providing due process allows publishers to investigate and challenge violations of their First Amendment rights, and helps subscribers challenge such violations through the correctional grievance system. *See Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996) (notice to the incarcerated person alone is insufficient because "[a]n inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication"). Correctional facilities in other jurisdictions provide due process to publishers and incarcerated persons when refusing to deliver publications and other correspondence. Eichenlaub Decl. ¶ 30. The BOP has an explicit policy requiring it to notify incarcerated persons and publishers, identifying the specific materials rejected and allowing independent review of a rejection decision. *Id.*; *see also Thornburgh*, 490 U.S. at 406.

Defendants failed to provide due process protections to HRDC when refusing to deliver its publications and correspondence to incarcerated persons at the Detention Facilities, even after HRDC brought the problem to Defendants' attention by submitting a government tort claim prior to filing this lawsuit. Wright Decl. ¶ 57. To date, Defendants have censored at least thirty-three (33) items of HRDC's mail, and HRDC did not receive

meaningful notice or opportunity to challenge the censorship of any of them. *Id.* ¶¶ 46-47, 56. The items of mail were merely returned to HRDC via the USPS Return to Sender service with various markings including, *inter alia*, "NO STAPLES," and "RTS, No 3rd party books, Amazon or Barnes and Noble." *Id.* ¶ 47. At no point did Defendants contact HRDC to provide notice that its mailings would be rejected or the reason(s) for the rejections. *Id.* ¶ 56.

Defendants may claim that rejecting the items of mail for delivery and returning them to HRDC via the USPS Return to Sender service qualifies as "notice," but this is not minimally adequate notice. First, none of the returned items contained any notice of a right to appeal the rejections, or any information on how HRDC could challenge the censorship. *Id.* ¶¶ 46-47, 56. Second, the returned mailings did not provide meaningful notice why the mail was rejected by Defendants. Even the County's summary rejection of HRDC's government tort claim provided no explanation as to why HRDC's mailings were censored or how HRDC could appeal the censorship. *Id.* ¶ 57 & Ex. H. Furthermore, Defendants did not return any of the nine hundred and sixty-four (964) additional items that were properly addressed to people incarcerated at the Detention Facilities, leaving HRDC without any information as to whether those items were censored and why, or if they were delivered, why the Detention Facilities delivered only those items but not others. *Id.* ¶ 43.

Defendants wholly failed to provide HRDC with any opportunity to challenge the censorship decisions, and Defendants' current Mail Policies make no provision for an appeal by the sender of mail. *See id.* ¶¶ 59-61 & Exs. I-K. Furthermore, any attempt to appeal would be futile because the censored items of mail are not retained for secondary review by another official at the Detention Facilities, as they were instead sent back to HRDC via the USPS Return to Sender service. *Id.* ¶¶ 45, 56. HRDC is thus likely to succeed on the merits of its due process claims.

**C. Defendants' Actions Violate the California Bane Act**

Defendants violated HRDC's rights under California Civil Code § 52.1 and

interfered with the exercise of HRDC's clearly established rights secured by the Constitution and laws of the United States and Constitution and laws of California. "The Bane Act authorizes individual civil actions for damages and injunctive relief by individuals whose federal or state rights have been interfered with by threats, intimidation, or coercion." *Scalia v. County of Kern*, 308 F.Supp.3d 1064, 1079 (E.D. Cal. 2018). The Bane Act does not require "that the coercion element be separate from the underlying constitutional or statutory violation." *Id.* at 1084. Rather, showing Defendants' "reckless disregard of the right at issue is all that is necessary." *Id.* (internal markings omitted) (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 803 (2017)).

Defendants' conduct described above, including the practices of censoring HRDC's mailings, Wright Decl. ¶¶ 44-51, failing to provide HRDC with adequate notice of the reasons for censoring its mailings, *id.* ¶¶ 47, 56, and failing to provide HRDC with any mechanism to challenge the censorship, *id.* ¶ 56, is objectively unreasonable and was undertaken recklessly and with deliberate indifference. Defendants' actions have caused actual damages to HRDC within the meaning of California Civil Code §§ 52 and 52.1 and will continue to cause damages absent a preliminary injunction. *Id.* ¶¶ 41, 44-46, 58.

## II. A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM.

Defendants' unconstitutional policies and practices prevent HRDC from carrying out its core function—to communicate with incarcerated persons about developments in the law and protection of their health and personal safety. Wright Decl. ¶¶ 13, 67-69. As the Supreme Court and Ninth Circuit have held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Klein*, 584 F.3d at 1207-08; *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005). Courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings. *See, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison mail policy); *Human Rights Defense Center v. Sw.*

*Va. Reg'l Jail Auth.*, No. 1:18-cv-00013, 2018 WL 3239299, at *6 (W.D. Va. July 3, 2018) (granting preliminary injunction against jail authority's ban on staples); *Prison Legal News v. Cnty of Ventura*, No. CV 14–773–GHK (ex), 2014 WL 2519402, at *8 (C.D. Cal. May 29, 2014) (granting preliminary injunction against jail's postcard-only policy); *Prison Legal News v. Betterton*, No. 2:12-CV-00699-JRG, Dkt. 59 at 10-12 (E.D. Tex. Sept. 30, 2013) (granting preliminary injunction against jail's impermissibly vague and arbitrary policy on mail censorship and inadequate appeals process); *Prison Legal News v. Cnty of Sacramento*, 2012 WL 1075852, at *1 (granting preliminary injunction against jail's ban on staples).

HRDC's magazines cover recent events and judicial decisions that affect the lives and legal cases of incarcerated persons, and its books provide incarcerated persons with in-depth information about their rights, protections and legal remedies, and on enrolling at accredited higher educational, vocational, and training schools. Wright Decl. ¶¶ 6, 8. The ability to deliver its publications and correspondence timely—and before news becomes stale or filing deadlines expire—is critical to HRDC's mission. *Id.* ¶ 67. If HRDC loses the opportunity to deliver these publications to incarcerated persons, it has lost precious opportunities to communicate with those persons at a time when that information will be most useful, in furtherance of its mission to help incarcerated persons access educational opportunities and educate themselves about their constitutional and human rights. *Id.* ¶¶ 6, 8, 67. Incarcerated persons also often move quickly in and out of jails, so if publications and correspondence are not delivered on a timely basis, HRDC may lose contact with the intended recipient permanently. *Id.* ¶ 67. An injunction is necessary to prevent irreparable harm to Plaintiff.

## III. THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION.

Given the irreparable harm suffered by HRDC if a preliminary injunction does not issue, the balance of equities here tips toward Plaintiff. The irreparable harm suffered by HRDC is concrete, severe and ongoing. *See* Wright Decl. ¶¶ 41, 56, 58, 67, 71. HRDC is blocked from distributing its publications and correspondence to incarcerated persons in

Defendants' custody, and without a preliminary injunction, Defendants will continue to censor HRDC's communications without due process, banning HRDC's core protected speech. By contrast, any potential injuries to Defendants are minimal and speculative. No great cost or expenditure of time is required to allow HRDC to deliver its publications and correspondence to incarcerated persons at the Detention Facilities and afford constitutionally mandated due process, as is already the case in correctional facilities across the country. *Id.* ¶¶ 11-12. Given the penological benefits of access to publications, the requested injunction would likely improve security and rehabilitation at the Detention Facilities. Eichenlaub Decl. ¶¶ 55-56. The balance of equities favors Plaintiff.

## IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

Courts have "consistently recognized the 'significant public interest' in upholding free speech principles … as the 'ongoing enforcement of the potentially unconstitutional regulations … would infringe not only the free expression interests of [plaintiffs], but also the interests of other people' subjected to the same restrictions." *Klein*, 584 F.3d at 1208 (citations omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. at 22. Defendants' mail and publications policies and practices harm not only HRDC, but also other publishers and booksellers—who presumably have been and will continue to be censored without due process if Defendants' unconstitutional policies and practices are not enjoined—as well as incarcerated persons at the Detention Facilities.

It is in the public interest to allow incarcerated persons access to reading materials, which enable them to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence. Eichenlaub Decl. ¶¶ 24, 26-27. By educating incarcerated persons about their rights and key legal developments that affect their lives and legal cases, HRDC encourages them to channel their energies into lawful methods of dispute resolution. Wright Decl. ¶ 13. Reading materials also help incarcerated persons keep their minds sharp, helping them prepare to become productive citizens when released

back into society. *Id.*; Eichenlaub Decl. ¶¶ 24, 27-28. This speaks to the hunger for expressive freedom that Justice Thurgood Marshall described in *Procunier*, 416 U.S. at 428 (Marshall, J., concurring) ("When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions …. It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit."). An injunction serves the public interest.

**V. THE BOND REQUIREMENT SHOULD BE WAIVED.**

Under Federal Rule of Civil Procedure Fed. R. Civ. P. 65(c), district courts have wide discretion to set the amount of the bond accompanying a preliminary injunction, which includes setting no bond or only a nominal bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

Several factors here warrant waiver of the bond requirement. The "harm" to Defendants if enjoined—*i.e.*, being forced to employ constitutional mail and publications policies—is minimal and non-monetary, if it exists at all. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."); *United Food & Com. Workers Loc. 99 v. Brewer*, 817 F. Supp. 2d 1118, 1128 (D. Ariz. 2011) ("no realistic likelihood" defendants would be harmed by injunction against enforcing law that violated the First Amendment).

Further, HRDC is a small nonprofit organization with a staff of approximately thirteen employees, and does not have financial resources to post anything more than a nominal bond. Wright Decl. ¶ 70; *see Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1191 (N.D. Cal. 2009) (not requiring small non-profit organization to post bond because plaintiff "indicated that it would have difficulty posting the bond"); *Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs.*, 181 F. Supp. 2d 1111, 1130 (E.D. Cal. 2001) (waiving bond requirement for not-for-profit public benefit corporation); *County of Ventura*, 2014 WL 2519402, at *10 (waiving bond requirement due to plaintiff's

"limited financial resources").

Requiring HRDC to post a bond would effectively deny access to prompt judicial review. *See Flowers*, 408 F.3d at 1126. This is especially true because HRDC alleges violations of its fundamental constitutional rights, seeks to vindicate the public interest, and is likely to succeed on the merits. *See Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 958-59 (N.D. Cal. 2015) (bond waived where plaintiffs were "protecting constitutional rights in the public interest, and they are likely to succeed on the merits"); *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (holding that "to require a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected by the policy"). The bond requirement should be waived.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be granted.

DATED: January 7, 2026

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: *Brenda Muñoz*
Brenda Muñoz

Attorneys for Plaintiff
HUMAN RIGHTS DEFENSE CENTER