UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE

HUMAN RIGHTS DEFENSE CENTER, )
)
PLAINTIFF, ) CASE NO.
)
vs. ) CV 25-03520-DSF
)
COUNTY OF RIVERSIDE, et al., )
) PAGES 1 TO 18
DEFENDANTS. )
)

REPORTER'S TRANSCRIPT OF
MOTION FOR PRELIMINARY INJUNCTION
MONDAY, MAY 2, 2026
1:37 P.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

ROSEN BIEN GALVAN & GRUNFELD LLP
BY: MARC J. SHINN-KRANTZ
101 Mission Street
Sixth Floor
San Francisco, California 94105

**FOR THE DEFENDANT:**

BURKE WILLIAMS & SORENSEN LLP
BY: NATHAN A. OYSTER
444 South Flower Street
40th Floor
Los Angeles, California 90071

**LOS ANGELES, CALIFORNIA; MONDAY, MARCH 2, 2026**

**1:37 P.M.**

---

01:36PM THE CLERK: Calling item Number 9, case number ED CV 25-3520-DSF, Human Rights Defense Center versus County of Riverside, et al.

Counsel, please stand and state your appearances.

MR. SHINN-KRANTZ: Good afternoon, Your Honor. 01:37PM Marc Shinn-Krantz for the plaintiff Human Rights Defense Center.

MR. OYSTER: Good afternoon, Your Honor. Nathan Oyster on behalf of defendants.

THE COURT: Good afternoon to both of you.

01:37PM Plaintiff wants to bar the defendants from refusing to deliver plaintiff's publications and correspondence. I understand the objection to the additional evidence submitted, but I was going to ask what has happened recently anyway. So I will ask my question.

01:37PM What's happened since what you have submitted?

MR. SHINN-KRANTZ: No further censorship return since those five that we submitted that we received in December of last year.

THE COURT: Okay. That's good news. Let's talk 01:38PM first about the no staples concern. The defense argues there's

no such rule, but the Riverside County sheriff's website says mail with staples will be rejected.

01:38PM So that seems inconsistent, Mr. Oyster, with your client's position.

MR. OYSTER: Your Honor, the staples issue is, if a magazine comes in with staples, what is under the policy supposed to happen is the staples are removed and then delivered to the inmate. So the no staples policy would be -- is consistent with the mail ultimately reaching the inmate.

01:39PM Just the staple is supposed to be removed.

And that's the way it is operating now. And as we submitted in our evidence in opposition, there was a time period at one of the facilities where a small amount of the periodicals with the staples were returned instead of having

01:39PM the staples removed.

THE COURT: What about this website?

MR. OYSTER: Well, I think the website is accurate and consistent. By saying that there is no -- no staples are permitted, that is consistent with what we're doing

01:39PM which is, when the facility receives the magazine with staples, the staples are simply removed, and then the mail is delivered to the inmates.

THE COURT: That is not the way anyone would read that.

01:40PM MR. OYSTER: Okay.

THE COURT: When is it going to be fixed?

MR. OYSTER: Well, I don't read it as inconsistent, but I will -- I understand the Court's position of understanding it to be inconsistent.

01:40PM THE COURT: It is inconsistent in that the explanation doesn't seem to make any sense. Why would they -- why would they care -- why would they need to know that you're going to remove the staples and then give them to the inmates? No staples sounds like no staples. And, in fact, several of

01:40PM these publications at least have been rejected by the no staples rule which apparently some of your sheriffs deputies or whomever is involved in this did not quite understand. So it needs to be fixed.

MR. OYSTER: If the Court's guidance is what

01:41PM would be best practices in terms of stating something, I can understand that. As to the reality, though, 97 percent roughly, even under the plaintiff's own numbers, of the periodicals were delivered even during this time period. So the plaintiff's takeaway should have been the mail is

01:41PM overwhelmingly being delivered to the inmates and there is no content-based censorship occurring.

THE COURT: Well, that's several parts. One, I certainly agree with you that there's a rather small percentage of documents, even assuming everything that was sent back to

01:41PM them was erroneous. It's a very small percentage. Nobody --

no entity does any process in that kind of volume without ever -- including the Courts. Sometimes something breaks down, and then we realize that certain people may not have gotten a notice. So we get right on it, and we send them the notice.

01:42PM You're going to have to change the language.

MR. OYSTER: Understood, Your Honor.

THE COURT: Okay. That's the staples.

No third-party books, that does seem to mean, as the plaintiff asserts, that inmates cannot get books unless 01:43PM they are sent from Amazon and Barnes -- or Barnes & Noble for which I'm sure Amazon and Barnes & Noble thank you. But what's the point of that?

MR. OYSTER: That simply relates to -- the efficiency of being able to screen content would be a way of 01:43PM addressing that. That's not a content-based -- a content-based restriction, meaning if a recipient were to know that there is -- that some.

Thing is through Amazon or Barnes & Noble, there is going to be knowledge about how the book is constructed that 01:43PM may not exist when it's coming from another sender.

THE COURT: So that's the only explanation you have is it's more efficient. It's not content-based?

MR. OYSTER: There are no content-based -- for what has been alleged here, there is no content-based issues. 01:44PM We're not alleging a content-based defense.

THE COURT: All right. There are a number of other complaints that, frankly, have only useless explanations or no explanations at all. Apparently there's a method for challenging rejections, but the plaintiffs certainly didn't know about it. So how is that being fixed so that the sender of rejected documents knows exactly what procedure to go through to challenge that?

01:44PM

MR. OYSTER: At this point, the plaintiff submitted additional evidence in the reply saying they did not receive -- they hadn't received the explanation that we're saying is consistent with the department's policy. So as with anything, the policy is in place to provide the sender with notice that there's been a rejection, and if that is not occurring, then simply there would be a training issue within the agency to ensure that the policy is being followed.

01:45PM

01:45PM

But at this point we're at a point of not having conducted any discovery to determine if any of the allegations made by the plaintiff at this point are factually supported. I mean, right now, we just have their declarations that have been submitted at this stage of the case.

01:45PM

THE COURT: The plaintiff's declarations.

MR. OYSTER: Correct.

THE COURT: And you have the defendants. Go ask them. You don't need to do discovery to know whether your sheriff's deputies are rejecting material. All you need to do

01:46PM

is go ask them.

MR. OYSTER: I agree with that. And our position is we're not doing that. Our position is we're not rejecting the plaintiff's material. That is our position, and it goes back -- the small number of rejections are for prior time periods, not for the current time period.

THE COURT: As I said, it certainly could be seen as de minimis. I don't know that it has been completely fixed by a lack of any recent rejections.

So I will hear from plaintiff's counsel if you want to respond to anything that Mr. Oyster said or add anything on behalf of the plaintiffs.

MR. SHINN-KRANTZ: Sure. Thank you, Your Honor. Again, Marc Shinn-Krantz for Human Rights Defense Center.

A few things. We don't agree with this being a de minimis issue. The First Amendment doesn't operate on a --

THE COURT: I was referring to the comparative numbers, not the value of the constitutional rights.

MR. SHINN-KRANTZ: Sure. There are at least 50 publications that have been blocked, not all of them returned to my client. So with dozens of instances, we're not seeing this as sort of a scattered or minimal amount of censorship.

Additionally, as to the additional --

THE COURT: So is your position still that it was content-based?

MR. SHINN-KRANTZ: Well, certainly as to this rule about no third-party vendors other than Amazon or Barnes & Noble, that is content neutral in name only. Human Rights Defense Center is the only distributor of the book "Protecting Your Health and Safety Nationwide." It's a publisher that has political speech that is, you know, critical of jail systems including the Riverside County jail system. It attempts to educate people about -- who live at the jails about their constitutional rights and their human rights. And so by not allowing a publisher like Human Rights Defense Center, that is necessarily content based.

THE COURT: I am not sure that is accurate. And the distinction is not based on content. It's based on the source of the material. There must be many other sources of material. I think bookstores are going out of business these days. But there are other book sellers who apparently can't get their books to Riverside facilities unless they go through Amazon.

MR. SHINN-KRANTZ: Well, Your Honor, the Human Rights Defense Center speech is its speech, and it has no other way to speak if this prohibition on third-party vendors were to stand.

I hadn't been sure, reading the defendants' briefing, whether they were actually standing by this no third-party vendor restriction or not, but it's concerning to

hear today that it is, that is the rule. You know, we only had four books returned to sender, but there were many more books that we sent in, and it's concerning to hear that those are not allowed either and they have been rejected as well. We certainly received no due process notice as to any of the books.

THE COURT: So you're suggesting that based on the volume of the books your client sent and the volume that were rejected that you know about, that there must be more?

MR. SHINN-KRANTZ: Yes. So there's sort of two issues that I'm suggesting here. We had four return-to-sender books and, you know, we sent in -- my client sent in 39 copies of "Protecting Your Health and Safety," 12 copies of "The Prisoner's Handbook," 2 copies of "The Habeas Cite Book." If the rule is none of those books can come in, there must have been more censorship than I was aware of even moments ago.

So that is a censorship problem under the First Amendment, but also a due process problem if we are not receiving notice of the censorship actions and the right to protest the action.

THE COURT: So there's two possibilities. One is that the other books, not the four that were rejected but the other books, either actually got to the inmates or they were rejected and discarded as opposed to being returned.

MR. SHINN-KRANTZ: That's right. And we have no

way to really know.

THE COURT: I'm not sure Riverside County knows either.

Mr. Oyster, do you know of that issue?

01:52PM MR. OYSTER: Yes, Your Honor.

Reviewing and referring the Court to the declarations that we submitted in opposition, looking at the Sergeant Marco Velez declaration, 26-1, and it clearly states at paragraph 17 on page 4, just referring to the Blythe Jail, 01:52PM the Blythe Jail does not ban "Prison Legal News," "Criminal Legal News," or any other publication distributed by Human Rights Defense Center which would incorporate any publication, meaning there is not a ban on the publications coming from this sender.

01:52PM And with respect to declaration -- Document 26-3, the declaration of Sergeant Feng Vang has the same evidence with respect to the Robert Presley Detention Center that there is not a ban on any publication from the Human Rights Defense Center.

01:53PM So logically, if there is no record of anything being rejected, it was delivered to the inmate, in much the same way that something gets sent through the United States mail could end up returned to sender but, if it doesn't, the presumption is it was delivered to the recipient as --

01:53PM THE COURT: The presumption occasionally is

incorrect.

MR. OYSTER: It's true. Unfortunately there is no way of guaranteeing something got from point A to point B in the way it is supposed to. But I think that we have a detailed log that the sheriff's department operates in terms of mail being returned, and the plaintiff also has a detailed log. And while the plaintiff in the reply brief was more focused on the differences, I would suggest that's -- the fact that the two sets of records align is a strong presumption that when we return something, we have returned it and, if we didn't return it and it's not in the log, it was delivered to the inmate as it was addressed.

THE COURT: That brings up another issue concerning the breadth of the proposed injunction.

Counsel, are you suggesting that this be a countywide injunction or just relate to the specific facilities with which you have been -- your clients have been having trouble?

MR. SHINN-KRANTZ: We are suggesting a countywide injunction, and that's partly because we don't know whether the two out of the five facilities where no mail has been returned to sender, we don't know what's happening there just based on the lack of due process. But we do know that at least three out of the five facilities have been returning items to us.

And it was very concerning in the defendants'

opposition brief to learn for the first time that there were at least a dozen additional publications from the Blythe facility alone that had been censored based on the staples issue that hadn't been returned to us and we never knew about. We had 01:55PM known about 29 issues of the "Prison Legal News" or "Criminal Legal News" magazines that had been censored to Blythe, and defendants admitted to 41 issues that had been censored from that facility alone. So given the lack of due process, we see a need for a countywide injunction.

01:56PM THE COURT: Well, I think some type of relief is appropriate, certainly not the relief that plaintiffs have submitted in their proposed order. Among other things, the order does not comply with Rule 65. And I think if -- if I issue an injunction, preliminary injunction, I would be 01:56PM inclined certainly to limit it to the issue of staples, third-party book issue and the appeal procedure. I will have to think about whether it should apply to all of the facilities.

But there shouldn't be any harm to having it 01:57PM apply to all of the facilities because the defense is contending they're doing everything right except for the occasional mistake anyway. Certainly, to give defense the benefit of the doubt, the confusing language about no staples needs to be fixed because that's on the county -- on the 01:57PM sheriff's website.

There really hasn't been much support for the Amazon and Barnes & Noble issue. I'm not sure I have enough information or briefing on the issue of content-based. It doesn't -- I don't know that it is content-based. I will have to think about that some more. But it just seems like a rule that's made, as defense counsel says, to help them be more efficient, that obviously does not trump the First Amendment. As I said, if you want to call it de minimus or not, it is a very, very small percentage and apparently been reduced even further.

Well, now apparently the plaintiffs know about the right to challenge. Have you seen anything that's described that? Is it sufficient, or are you asking for some further relief now that you know there is a process?

MR. SHINN-KRANTZ: That's right. Now we have been informed about this notification of denied mail publication form that the County has. Certainly if they were to reject publications going forward, both under their policy and the constitution, they would have to fill out this form and actually provide it to the incarcerated person, provide it to us, and per their policy, they would have to keep a copy of it in their files.

It's not clear whether that's happened at all. The defendants did not submit any of these from their files in their response brief, and they certainly didn't send any to

Human Rights Defense Center. So we would want them to actually fill out the form. Now we know about the appeal process.

I do have a couple concerns about the form itself, and the most important concern is that, you know, midway -- I'm looking at document ECF Number 27 at -- ECF page 17, about midway down the page there is a line for the signature of the captain or designee who is making the decision to censor or block the item. Then in the notification to the sender, it says that appeals must be filed within 20 days. Appeals shall be made to the captain or designee.

So it's asking us to appeal to the person who made the decision which under Supreme Court and 9th Circuit case law is clearly inadequate. You have to be able to appeal to someone other than the decision maker.

My other concern with the form is that there are no instructions about how to fill it out. There is certainly -- this would be a big improvement to have the description of the item denied and the reason for denial. But if they're just putting the bare-bones violates mail policy or something like that or no third-party books or no staples, which seems like it may be a violation of their own policy, that would not be enough for the reason of denial. We would want enough substance for why they're denying something in order to be able to effectively challenge it.

THE COURT: All right. I don't think we're at

the stage where I'm micromanaging how a form works or what's required.

MR. SHINN-KRANTZ: Your Honor, just on that, we're not suggesting that you order a particular change to the form. I think that the language that we put into the proposed order would be sufficient that defendants shall provide adequate written notice. You don't have to make any reference to the specific form.

THE COURT: I'm not -- I don't want to issue an order and then have you coming back here saying -- one of you saying adequate written notice is too vague because it's pretty vague.

It's likely that I will grant the motion for preliminary injunction in part. If either side wants to submit something additional based on what's come up during this hearing, I will give you two weeks to do so. So that is March -- well, let's make it March 23rd. No more than ten pages.

But also, I would suggest that you sit down together, if you can manage to cooperate as attorneys should be able to do, and see what issues you can resolve. Maybe you can work on the notice and the form and certainly fix the no staples website, or I will. And then if you want to submit something on this content-based issue, you can. But I think the limitation based on efficiency may have some problems. But

as I said, you can submit further briefing on that.

All right. I will await further briefing and decide what injunction, if any, I'm inclined to issue preliminarily. I would not require a bond and, again, suggest that you look carefully at Rule 65 and comply with that because the present proposed preliminary injunction doesn't work.

02:04PM

Anything else I can do for you today?

MR. OYSTER: Nothing else from the defense, Your Honor.

02:05PM

MR. SHINN-KRANTZ: No, Your Honor. Thank you.

THE COURT: All right. Thank you.

(Proceedings concluded at 2:05 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 9TH DAY OF MARCH, 2026.

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER